UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ISAIAH ROSS,

                     Plaintiff,

        v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                   Defendant.

_____

<u>DECISION & ORDER</u>

13-CV-6332P

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Isaiah Ross ("Ross) brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his applications for Supplemental Security Income and Disability Insurance Benefits ("SSI/DIB").  Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge.  (Docket # 6).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  (Docket ## 12, 16).  For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and complies with applicable legal standards.  Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Ross's motion for judgment on the pleadings is denied.

## BACKGROUND

### I.   Procedural Background

Ross protectively filed for SSI/DIB on October 19, 2010, alleging disability

beginning on June 19, 2010, as a result of HIV infection and depression.  (Tr. 166, 180).[1]  On

December 30, 2010, the Social Security Administration denied both of Ross's claims for

benefits, finding that he was not disabled.  (Tr. 70-71).  Ross requested and was granted a

hearing before Administrative Law Judge Scott M. Staller (the "ALJ").  (Tr. 80-81, 107-11).

The ALJ conducted a hearing on October 20, 2011.  (Tr. 43-69).  Ross was represented at the

hearing by his attorney, Kelly Laga, Esq.  (Tr. 43, 79).  In a decision dated February 3, 2012, the

ALJ found that Ross was not disabled and was not entitled to benefits.  (Tr. 19-32).

On May 6, 2013, the Appeals Council denied Ross's request for review of the

ALJ's decision.  (Tr. 1-6).  Ross commenced this action on July 1, 2013, seeking review of the

Commissioner's decision.  (Docket # 1).

### II.   Relevant Medical Evidence[2]

####    A.   Treatment Records

#####       1.   University of Rochester Medical Center

Treatment notes indicate that Ross was referred to treatment at the Infectious

Diseases Department of the University of Rochester Medical Center ("URMC") in August 2010

after testing positive for HIV that same month.  (Tr. 450-52).  Ross met with Madonna Biritwum

("Biritwum"), MD, a fellow at URMC and Amneris Luque ("Luque"), MD, her supervising

---

[1]  The administrative transcript shall be referred to as "Tr. __."

[2]  Ross does not challenge the ALJ's physical RFC assessment.  Thus, records pertaining to Ross's physical
impairments are not summarized herein.

physician. (*Id.*). During the visit, Ross reported that he had been very depressed since learning of his diagnosis and had experienced insomnia, difficulty concentrating, reduced energy and loss of appetite. (*Id.*). Ross reported suicidal thoughts, but did not have any intention of harming himself. (*Id.*). His mother, who accompanied him to the appointment, reported that Ross had significant family support. (*Id.*).

Ross reported that he had completed the eleventh grade and had become a certified nurse's assistant ("CNA") in 2005. (*Id.*). According to Ross, he had worked as a CNA until July 2009 when his contract was terminated. (*Id.*). Ross reported that he had found another job, but had quit in February 2010 and had not been employed since that time. (*Id.*). Biritwum and Luque indicated that they would obtain a mental health referral for Ross. (*Id.*).

On September 21, 2010, Ross returned for a follow-up appointment with Biritwum and Luque. (Tr. 419-23). The treatment notes indicate that Ross had been referred for an urgent appointment with a psychiatrist, but that Ross failed to follow-up on the referral. (*Id.*). During the appointment, Ross indicated that his family support was very strong, his appetite and energy were returning, and that he was no longer depressed or suicidal, although he was experiencing some anxiety. (*Id.*). Ross reported that his primary care physician had prescribed Ambien to assist his sleep and requested a renewal of the prescription. (*Id.*). Biritwum and Luque prescribed a different medication to assist with sleeping. (*Id.*).

Treatment notes indicate that Ross met with Julie Miller ("Miller"), LMSWR, on October 5, 2010. (Tr. 276). Miller indicated that she had contacted Strong Behavioral Health for a mental health referral, but Ross had failed to complete the intake evaluation. (*Id.*). Ross informed Miller that he continued to live with his mother, but was hoping to move out. (*Id.*).

On November 2, 2010, Ross saw Miller again and informed her that he was applying for SSI/DIB because he needed money as he had not yet found employment. (Tr. 275). Miller contacted Biritwum and requested that she complete paperwork for Ross. (*Id.*). Ross also reported that the Monroe County Department of Health and Human Services had required him to attend a mental health appointment at Genesee Mental Health Center and that he had obtained a list of mental health providers. (*Id.*). Ross reported that he planned to contact one of the providers the following week. (*Id.*).

That same day Ross met with Biritwum and Luque. (Tr. 415-18). Ross reported that he continued to experience depression, but that he was no longer suicidal and refused a mental health referral. (*Id.*). Ross indicated that "Social Security Services" had insisted that he see a mental health physician, but he had not yet done so. (*Id.*). Ross reported that he was currently taking GED classes twice a week. (*Id.*). Biritwum and Luque assessed that Ross's appetite continued to be poor, that he appeared to have a depressed mood with intermittent anxiety, but that he was sleeping better. (*Id.*). They encouraged Ross to see a mental health physician. (*Id.*).

On December 8, 2010, Ross attended another appointment with Biritwum and Luque. (Tr. 403-06). During the appointment, Ross reported being depressed but not suicidal and that he had an appointment with a mental health provider scheduled for the following day. (*Id.*). Biritwum and Luque assessed no mood disturbance, but noted that Ross continued to suffer from poor sleep. (*Id.*).

Ross returned for an appointment with Biritwum and Luque on March 23, 2011. (Tr. 383-86). During the appointment, Ross reported that he had been working as a CNA in a nursing home for the past month. (*Id.*). Biritwum and Luque assessed no mood disturbance and

noted that Ross's appetite was good and he was sleeping well.  (*Id.*).  On June 8, 2011, Ross

returned for a follow-up appointment reporting that he continued to work as a CNA and had

successfully obtained his GED.  (Tr. 380-82).

On June 8, 2011, Ross attended another appointment with Biritwum and Luque.

(Tr. 501-03).  The treatment notes indicate that Ross continued to work as a CNA in a nursing

home at night.  (*Id.*).  Ross reported feeling and sleeping well and that he had a good appetite.

(*Id.*).  Ross exhibited no depression, PTSD, anxiety or suicidal ideation.  (*Id.*).

### 2.    <u>Jefferson Family Medicine</u>

Treatment notes indicate that between August 2010 and September 2011, Ross

received treatment from Mark A. Brown ("Brown"), MD, at Jefferson Family Medicine.

(Tr. 453-79).  On August 23, 2010, Ross attended an appointment with Brown and advised

Brown that he had recently been diagnosed with HIV.  (Tr. 454-55).  Ross reported that he

initially experienced depression, anxiety and suicidal thoughts after his diagnosis, but that he no

longer experienced those feelings.  (*Id.*).  Ross also reported that he experienced trouble sleeping

since learning of his diagnosis.  (*Id.*).  Brown referred Ross to the Strong Infectious Disease

Department for treatment and prescribed Ambien to address his trouble with sleeping.  (*Id.*).

On September 23, 2010, Ross attended a follow-up appointment with Brown.

(Tr. 456-57).  Ross reported that he had been prescribed Buspar by Biritwum and Luque to assist

with sleeping.  (*Id.*).  Ross reported that he was experiencing some depression since his diagnosis

and thought about dying, but did not have any active suicidal ideation.  (*Id.*).  Brown prescribed

Trazodone, in addition to the Buspirone to assist Ross's depression.  (*Id.*).

Ross attended another appointment with Brown on December 1, 2010.

(Tr. 458-60).  During the appointment, Ross requested that Brown perform an examination in

connection with Ross's SSI/DIB application.  (*Id.*).  The treatment notes indicate that Brown

performed an examination and completed a form for Ross's SSI/DIB application.  (*Id.*).

On February 14, 2011, Ross returned for an appointment with Brown.

(Tr. 461-67).  During the appointment, Ross reported that his mood had improved, he had been

exercising and staying active, and he had discontinued taking Buspar.  (*Id.*).  Ross reported that

he continued to awaken at approximately 3:00 a.m., although less frequently.  (*Id.*).  Ross also

reported that he had been seeing a therapist at St. Mary's, but she had left and he had not yet met

with her replacement.  (*Id.*).  Brown opined that Ross's depression appeared to have resolved,

and he discontinued the Buspirone prescription.  (*Id.*).  On September 26, 2011, Ross returned

for another appointment with Brown and reported that he continued to have trouble sleeping, but

was sleeping at least four hours a night.  (Tr. 472).

### 3.      St. Mary's Mental Health

On December 9, 2010, Ross had a mental health evaluation by Ese

Moynihan-Ejaife, ("Moynihan-Ejaife"), MA.  (Tr. 350-57).  Treatment notes indicate that

Moynihan-Ejaife diagnosed Ross with Major Depressive Disorder, recurrent, moderate severity,

anxiety disorder, not otherwise specified, and rule out panic disorder with agoraphobia.  (*Id.*).

During the appointment, Ross reported that, after a mental health evaluation, the Department of

Social Services had recommended mental health treatment for depression and anxiety.  (*Id.*).

Ross reported that his depression and anxiety caused difficulties concentrating and sleeping and

negatively affected his appetite and motivation.  (*Id.*).  Ross explained that his depression started

when he was diagnosed with HIV in August 2010.  (*Id.*).  Ross also reported that he had been

experiencing anxiety when he left his house, characterized by sweating, nervousness and

increased heart rate.  (*Id.*).  Ross also reported sleep disturbance.  (*Id.*).  Ross reported that he was not working and spent his time volunteering at church and attending school part-time.  (*Id.*).

Upon examination, Moynihan-Ejaife noted that Ross appeared appropriately dressed, demonstrated a soft speech, logical and coherent thought form, a preoccupied thought process, depressed mood, blunt affect, full orientation, fair judgment and superficial insight. (*Id.*).  Moynihan-Ejaife recommended that Ross be admitted to individual psychotherapy treatment.  (*Id.*).

On December 21, 2010, Ross underwent a comprehensive mental health evaluation administered by Crystal Hunter ("Hunter"), MHC.  (Tr. 341-49).  Hunter noted that Ross was appropriately dressed and demonstrated appropriate behavior, unremarkable motor movements, normal speech, logical and coherent thought form and thought processes characterized by guilt, helplessness, hopelessness and worthlessness.  (*Id.*).  Ross also demonstrated normal perception, affect within normal range, full orientation, good insight and fair judgment.  (*Id.*).

Treatment notes suggest that Ross met with Hunter for a therapy session on January 6, 2011, but it appears that Hunter left her employment with St. Mary's Mental Health before completing the treatment notes for that session.  (Tr. 358-61).  Ross was discharged from treatment on March 1, 2011.  (Tr. 362-66).  The treatment notes indicate that Ross attended one therapy session with Hunter, who then left her employment with the clinic.  (*Id.*).  The therapist who was assigned to cover Hunter's caseload attempted to contact Ross, but was unsuccessful. (*Id.*).  According to the treatment notes, Ross did not respond to any of the clinic's outreach attempts.  (*Id.*).

B.      **Medical Opinion Evidence**

1.      **Kavitha Finnity, PhD**

On December 22, 2010, state examiner Kavitha Finnity ("Finnity"), PhD,
conducted a consultative psychiatric evaluation of Ross.  (Tr. 242-45).  Ross reported that he
lived with his mother or his aunt.  (*Id.*).  Ross reported he was in the process of obtaining his
GED and that he had worked for a number of years as a CNA, but had stopped working due to
depression.  (*Id.*).

According to Ross, he experienced difficulty sleeping and decreased appetite,
interest and energy.  (*Id.*).  Ross reported depressive symptoms, including a dysphoric mood,
crying and irritability.  (*Id.*).  Ross also reported anxiety, including panic attacks characterized by
heart palpitations, sweating and difficulty breathing.  (*Id.*).  Ross explained that he had difficulty
concentrating, focusing and maintaining attention.  (*Id.*).  Ross indicated that he was able to care
for his personal hygiene, do laundry, manage his money and drive.  (*Id.*).  Ross also reported that
he socialized with friends, had a good relationship with his family and enjoyed reading and
watching television.  (*Id.*).

Upon examination, Finnity noted that Ross appeared appropriately dressed and
well-groomed, with normal gait, motor behavior, posture and eye contact.  (*Id.*).  Finnity opined
that Ross had fluent, clear speech with adequate language, coherent and goal-directed thought
processes, depressed affect, dysthymic mood, clear sensorium, full orientation, and average
intellectual functioning with a general fund of information appropriate to his experience.  (*Id.*).
Finnity noted that Ross's attention and concentration were intact.  (*Id.*).  Finnity found Ross's
recent and remote memory skills intact.  (*Id.*).  According to Finnity, Ross could recall three out

of three objects immediately and two out of three objects after five minutes, and he could complete five digits forward and four back.  (*Id.*).

According to Finnity, Ross could follow and understand simple directions, perform simple tasks, maintain a regular schedule, learn new tasks, perform complex tasks, make appropriate decisions and relate with others, although Ross has some difficulty with attention and concentration and dealing with stress.  (*Id.*).  According to Finnity, Ross could manage his own finances, and his prognosis was fair to good.  (*Id.*).

## 2.     R. Altmansberger, Psychology

On April 12, 2010, agency medical consultant Dr. R. Altmansberger ("Altmansberger") completed a Psychiatric Review Technique.  (Tr. 256-69).  Altmansberger concluded that Ross's mental impairments did not meet or equal a listed impairment.  (*Id.*).  According to Altmansberger, Ross suffered from mild limitations in his activities of daily living and moderate limitations in his ability to maintain social functioning and to maintain concentration, persistence or pace.  (*Id.*).  In addition, according to Altmansberger, Ross had not suffered from repeated episodes of deterioration.  (*Id.*).  Altmansberger completed a mental Residual Function Capacity ("RFC") assessment.  (Tr. 270-73).  Altmansberger opined that Ross suffered from moderate limitations in his ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, work in coordination with or proximity to others without being distracted by them, accept instructions and respond appropriately to criticism from supervisors, complete a normal workday and workweek without interruptions from psychologically-based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, and respond appropriately to changes in the work setting.  (*Id.*).

3.      **Brown's Opinion**

On December 1, 2010, Brown completed a medical source statement regarding Ross's ability to perform work-related activities, the relevant portions of which are discussed herein. (Tr. 314-23). Brown opined that Ross suffered from depression, but that he did not have any limitations in his ability to understand, remember and carry out instructions. (*Id.*). According to Brown, Ross was able to respond appropriately to supervisors, coworkers and work pressures in a work setting other than in stressful situations. (*Id.*). Brown noted that Ross's attitude, appearance, behavior, speech, thought, perception, insight and judgment were good, but that he exhibited a depressed mood and affect. (*Id.*). Brown opined that Ross was able to function in a work setting up to twenty hours per week. (*Id.*). According to Brown, Ross had no limitations in his ability to understand, remember and interact socially, but opined that Ross could only sustain concentration and persistence up to four hours per day. (*Id.*). Brown indicated that Ross was limited in his ability to respond to stressful situations and that he could not perform complex tasks. (*Id.*).

III.    **Non-Medical Evidence**

In his application for benefits, Ross reported that he was born in 1987. (Tr. 143). Ross reported that he had completed the eleventh grade in a regular classroom setting and had received training to become a CNA. (Tr. 166-67). According to Ross, he had previously been employed in nursing homes as a CNA and as a dietary aide. (*Id.*).

Ross's mother and his aunt each completed a function report in connection with Ross's application. (Tr. 183-98, 207-14). According to Ross's mother, Alleana Ross ("Alleana"), Ross lives with her and stays in her basement. (Tr. 183). During the day, according

to Alleana, Ross will care for his personal hygiene and then spend the day on the couch or in a chair. (*Id.*). According to Alleana, Ross experiences trouble sleeping and no longer prepares his own meals. (Tr. 184.). Alleana reported that she must remind Ross to take his medication. (Tr. 185). According to Alleana, Ross does not do any housework, although he is able to clean his sleeping area and wash his clothes when he is feeling well. (Tr. 185-86).

Alleana reported that Ross was able to go shopping for personal hygiene items approximately once a  month and is able to manage his own finances. (Tr. 186-87). According to Alleana, Ross attends church weekly and visits his aunt multiple times during the week. (*Id.*). Alleana indicated that Ross used to be very outgoing, but now is often alone. (*Id.*). Alleana stated that Ross did not have any problems getting along with others. (*Id.*). According to Alleana, since his diagnosis, Ross has problems paying attention and concentrating but is able to follow written and verbal instructions if they are repeated to him. (*Id.*). Alleana indicated that Ross did not have any problems getting along with persons in authority. (*Id.*). According to Alleana, Ross has experienced increased stress and difficulties with his memory since his diagnosis. (*Id.*). Alleana repeated this information in a third-party function report that she completed. (Tr. 199-206).

Ross's aunt, Nina Ross ("Nina"), reported that Ross spends his days caring for his personal hygiene, eating meals prepared by others, taking his medication, lying on the couch or sitting in a chair and socializing "a little." (Tr. 207). According to Nina, Ross is able to care for his personal hygiene, but does not prepare his own meals. (Tr. 208). Nina also reported that Ross needs reminders to take his medication and attend his doctors' appointments. (Tr. 209). Nina also reported that Ross is able to clean his own sleeping area and wash his laundry when he feels well. (*Id.*). According to Nina, Ross attends church, visits her at her house, and goes

shopping once or twice per month for personal hygiene items.  (Tr. 210).  Nina indicated that Ross is capable of handling his own finances.  (Tr. 211).

According to Nina, Ross does not have any problems getting along with others, including persons in positions of authority.  (Tr. 211, 213).  Nina reported that Ross has difficulty paying attention and concentrating, but is able to follow written and verbal instructions.  (Tr. 213).

During the administrative hearing, Ross testified that he had completed the eleventh grade in a regular classroom setting and had obtained his GED.  (Tr. 49).  Ross also reported that he was currently working part-time at Blossom North Nursing Home, but had been on medical leave for approximately one month.  (*Id.*).  Ross testified that he had gone on leave after being diagnosed with a kidney disease.  (Tr. 51).  According to Ross, he began work as a CNA at Blossom North Nursing Home in February 2011.  (Tr. 62).  Ross testified that his job duties included monitoring residents, caring for residents and completing paperwork.  (*Id.*).  Ross testified that his job performance suffered from his lack of sleep and that he did not think he would be able to return to work after his medical leave due to pain, nausea and anxiety. (Tr. 62-63).

Ross testified that he has been unable to perform his job since he was diagnosed with HIV because he suffers from depression, anxiety, loss of appetite and loss of sleep.  (Tr. 51, 59).  According to Ross, he experiences mood swings and has difficulty communicating with others.  (Tr. 53).  In addition, due to his anxiety, he sweats frequently, his heart races and he experiences difficulty breathing when he is getting ready to leave the house.  (*Id.*).

Ross testified that his anger has made it difficult to get along with other people. (Tr. 54).  According to Ross, he can be around other people so long as he does not have to

12

interact with them. (*Id.*). Ross testified that he spends his days caring for his personal hygiene, taking his medication, napping and taking it easy. (Tr. 55). According to Ross, his mother prepares his meals. (*Id.*). Ross testified that he does not complete any housework and does not go grocery shopping. (Tr. 56). According to Ross he visits his friends approximately once a week. (*Id.*).

Vocational expert, James R. Newtown ("Newton"), also testified during the hearing. (Tr. 63-67, 134). The ALJ first asked Newton to characterize Ross's previous employment. (Tr. 64). According to Newton, Ross previously had been employed as a dietary aid and a nurse's assistant. (*Id.*).

The ALJ asked Newton whether a person would be able to perform Ross's previous jobs who was the same age as Ross, with the same education and vocational profile, and who was able to understand, remember and carry out only simple instructions, make judgments on simple work-related decisions, interact appropriately with supervisors and workers in a routine setting, respond to usual work situations and changes in a routine work setting, maintain attention and concentration for two-hour segments over an eight-hour work period, complete a normal workweek without excessive interruptions, who could perform the full range of sedentary work with occasional postural limitations and who could frequently reach, handle, or finger with their upper left extremity, but had no limitations on their dominant, upper right extremity. (Tr. 64-65). Newton testified that such an individual would be unable to perform the previously-identified jobs, but would be able to perform other positions in the national economy, including table worker, stuffer and patcher.[3] (Tr. 65-66). The ALJ then asked Newton whether jobs would exist for the same individual with the same limitations, except that the individual

[3] Due to audibility issues, the transcriber was unable to transcribe Newton's responses of "stuffer" or "patcher;" however, these are the titles of the positions associated with the Dictionary of Occupational Title numbers identified by Newton during the hearing.

would be off-task approximately twenty percent or more of the workday.  (Tr. 66).  Newton

opined that such an individual would not be able to maintain employment on a full-time,

competitive basis.  (*Id.*).  The ALJ then asked Newton to assume that the individual would be

absent from work more than two days per month.  (*Id.*).  Again, Newton testified that such an

individual would not be able to maintain employment on a full-time, competitive basis.  (*Id.*).


## DISCUSSION

### I.   Standard of Review

This Court's scope of review is limited to whether the Commissioner's

determination is supported by substantial evidence in the record and whether the Commissioner

applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004)

("[i]n reviewing a final decision of the Commissioner, a district court must determine whether

the correct legal standards were applied and whether substantial evidence supports the

decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also*

*Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo*

whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's

conclusions are supported by substantial evidence in the record as a whole or are based on an

erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C.

§ 405(g), a district court reviewing the Commissioner's determination to deny disability benefits

is directed to accept the Commissioner's findings of fact unless they are not supported by

"substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to

any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is

defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401

(1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must

consider the record as a whole, examining the evidence submitted by both sides, "because an

analysis of the substantiality of the evidence must also include that which detracts from its

weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent

they are supported by substantial evidence, the Commissioner's findings of fact must be

sustained "even where substantial evidence may support the claimant's position and despite the

fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise."  *Matejka v.*

*Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d

60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled if he or she is unable "to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).  When assessing

whether a claimant is disabled, the ALJ must employ a five-step sequential analysis.  *See Berry*

*v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*).  The five steps are:

> (1)    whether the claimant is currently engaged in substantial
>         gainful activity;
>
> (2)    if not, whether the claimant has any "severe impairment"
>         that "significantly limits [the claimant's] physical or mental
>         ability to do basic work activities";
>
> (3)    if so, whether any of the claimant's severe impairments
>         meets or equals one of the impairments listed in Appendix
>         1 of Subpart P of Part 404 of the relevant regulations;

(4)    if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and

(5)    if not, whether the claimant retains the residual functional capacity to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

### A.    <u>The ALJ's Decision</u>

In his decision, the ALJ followed the required five-step analysis for evaluating disability claims.  (Tr. 19-32).  Under step one of the process, the ALJ found that Ross had not engaged in substantial gainful activity since October 19, 2010, the application date.  (Tr. 21).  At step two, the ALJ concluded that Ross has the severe impairments of anxiety disorder, major depressive disorder, HIV and a history of proteinuria.  (*Id.*).  At step three, the ALJ determined that Ross does not have an impairment (or combination of impairments) that meets or medically equals one of the listed impairments.  (Tr. 21-23).  With respect to Ross's mental impairments, the ALJ found that Ross suffered from moderate difficulties in maintaining concentration, persistence or pace and social functioning and mild limitations in activities of daily living.  (*Id.*).  The ALJ concluded that Ross had the RFC to understand, remember and carry out simple instructions, make judgments on simple work-related decisions, interact appropriately with supervisors and workers in a routine work setting, respond to usual work situations and to changes in a routine work setting, maintain concentration and attention for two-hour segments

over an eight-hour period, and complete a normal workweek without excessive interruptions from psychologically or physically-based symptoms, and to perform sedentary work, except that Ross could only use his left, non-dominant upper extremity to frequently reach, handle and finger and could only occasionally climb, balance, stoop, knee, crouch or crawl. (Tr. 24). At step four, the ALJ determined that Ross was unable to perform past work as a dietary aide and nurse's assistant. (Tr. 31). Finally, at step five, the ALJ concluded that Ross could perform other jobs in the local and national economy, including table worker, stuffer and patcher. Accordingly, the ALJ found that Ross is not disabled. (*Id.*).

**B.**    **Ross's Contentions**

Ross contends that the ALJ's mental RFC determination is not supported by substantial evidence and is the product of legal error. (Docket # 12-1). First, Ross maintains that the ALJ's RFC determination is the product of legal error because the ALJ failed to resolve conflicts between his RFC and the opinions of Ross's mental capabilities provided by Finnity and Altmansberger upon which the ALJ relied. (*Id.* at 14-16). Next, Ross maintains that those opinions, in any event, were too vague and confusing to warrant the ALJ's reliance. (*Id.* at 17-18). Third, Ross contends that the ALJ failed to account for the stress limitations assessed by Finnity and Brown. (*Id.* at 18-21). Ross further contends that the ALJ's mental RFC assessment is the product of legal error because the ALJ failed to reconcile the moderate impairments he assessed at step three with the mental RFC he ultimately determined. (Tr. 21-22). Finally, Ross also challenges the ALJ's step five assessment on the grounds that the vocational expert's testimony cannot provide substantial evidence because it was based upon a flawed RFC assessment.

## II.   <u>Analysis</u>

### A.   <u>Mental RFC Assessment</u>

An individual's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (July 2, 1996)).  When making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)).  "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 380 F. App'x 231 (2d Cir. 2010).

I turn first to Ross's contention that the ALJ failed to account for limitations assessed by Finnity and Altmansberger.  (Docket # 12-1 at 15-16).  Specifically, Ross maintains that the ALJ's RFC assessment fails to account for Finnity's opinion that Ross suffered from some limitations in his ability to maintain attention and concentration and in his ability to deal with stress.  (*Id.*).  Ross also maintains that the ALJ failed to account for the moderate limitations assessed by Altmansberger, which included limitations in Ross's ability to maintain attention and concentration for extended periods, perform activities within a schedule and maintain attendance and punctuality, work in coordination with or proximity to others, complete a normal workday or workweek without interruption, and accept instructions and respond to criticism from supervisors.  (*Id.*).

I disagree with Ross that the ALJ failed to consider the limitations assessed in the medical opinions of record or that the ALJ's RFC assessment fails to adequately account for Ross's mental capabilities.  In his decision, the ALJ thoroughly discussed Finnity's opinion and specifically noted that Finnity assessed that Ross has some limitations in his ability to maintain attention and concentration and to deal with stress.  (Tr. 30).  The ALJ further noted that despite these limitations, Finnity concluded that Ross's attention, concentration and memory skills were intact and that Ross was able to learn new tasks, perform complex tasks, make appropriate decisions, relate with others and maintain a regular schedule.  (Tr. 23).

With respect to Ross's ability to maintain concentration and attention, Finnity opined that Ross had "some limitations in his ability to maintain attention and concentration." Contrary to Ross's contention, I conclude that the ALJ incorporated Finnity's opinion into his RFC assessment by including the limitation that Ross could only sustain attention and concentration for up to two hours at a time. *See Buscemi v. Colvin*, 2014 WL 4772567, *14 (W.D.N.Y. 2014) (ALJ adequately accounted for attention and concentration limitations in the RFC assessment "by incorporating the limitation that [claimant] could only sustain attention and concentration for up to two hours at a time").  Ross has failed to provide any support for his contention that Finnity's conclusion that he has "some" limitations in his ability to maintain concentration and attention required the ALJ to conclude that he could not maintain concentration and attention for as much as two hours at a time.

With respect to the stress-related limitations assessed by Finnity,[4] I likewise conclude that the ALJ adequately accounted for those limitations.  Although Finnity identified

---

[4]  As noted by Ross, Brown also assessed that Ross had limitations in his ability to respond to stressful situations.  (Docket # 12-1 at 19-20).  The ALJ gave limited weight to Brown's assessment, a determination which is supported by the record.  Brown's assessment was provided in December 2010.  (*Id.*).  In treatment notes dated February 14, 2011, however, Brown opined that Ross's depression appeared to have resolved.  (Tr. 461-67).  In any

"some" limitations in Ross's ability to manage stress, Finnity also determined that despite those

limitations, Ross retained the ability to perform simple tasks, make simple work-related

decisions, maintain a regular schedule and relate with others.  (Tr. 244).  Finnity's conclusions

are consistent with the ALJ's conclusion that Ross was able to perform the basic mental demands

of unskilled work.  SSR 85-15, 1985 WL 56857, *4 (1985) ("[t]he basic mental demands of

competitive, remunerative, unskilled work include the abilities (on a sustained basis) to

understand, carry out, and remember simple instructions, to respond appropriately to supervision,

coworkers and usual work situations, and to deal with changes in a routine work setting").  In

addition to limiting Ross to unskilled work, the ALJ further accounted for Ross's stress and

attention limitations by restricting Ross to positions requiring him to maintain attention for no

more than two-hour segments and make only simple work-related decisions.  I conclude that the

ALJ adequately accounted for the stress-related limitation identified by Finnity.  *See Grogg v.

Comm'r of Soc. Sec.*, 2014 WL 1312325, *1 (N.D.N.Y. 2014) (ALJ's determination that

claimant could "handle a reasonable level of simple, repetitive work-related stress, and perform

work-related activities effectively under stress" was not inconsistent with consultative

examiner's opinion that claimant had "some difficulty dealing with stress").

Although the ALJ did not discuss each of the moderate limitations assessed by

Altmansberger, he incorporated moderate limitations into his RFC by restricting Ross to jobs that

require an individual to understand, remember and carry out simple instructions, make only

simple work-related decisions and maintain attention and concentration for only two-hour

segments.  *See Retana v. Astrue*, 2012 WL 1079229, *6 (D. Colo. 2012) (ALJ did not have to

thoroughly discuss each moderate limitation; "ALJ's RFC adopted some of [doctor's] moderate

---

event, as discussed herein, I conclude that the ALJ adequately accounted for any stress-related limitations supported
by the record when determining Ross's RFC.

limitations such as restricting plaintiff to unskilled work not involving complex tasks, reflecting

plaintiff's moderate limitations in his ability to carry out detailed instruction and to maintain

concentration for extended periods"); *Ryan v. Astrue*, 650 F. Supp. 2d 207, 217 (N.D.N.Y. 2009)

("despite granting little weight to [the doctor's] opinions, [the ALJ] accounted for [p]laintiff's

difficulties with concentration and stress in his RFC[;] [t]herefore, had the ALJ opted to grant

[the doctor] a greater weight, it would not have affected his RFC").  In doing so, the ALJ

discussed at length the information contained in Ross's treatment notes and the information

contained in Finnity's report.  Specifically, the ALJ noted that Ross initially failed to follow-up

on referrals to mental health treatment and was ultimately discharged from mental health

treatment for non-attendance.  (Tr. 29-30).  Additionally, the ALJ noted that in February 2011

Ross reported that he had obtained new employment as a CNA.  (Tr. 26).  The ALJ further noted

that by June 2011 Ross reported to Biritwum and Luque that he no longer experienced

depression-related symptoms.  (Tr. 30).

        I likewise reject Ross's remaining challenges to the ALJ's mental RFC

assessment.  Although Ross is correct that an expert opinion may describe a claimant's

impairments in terms that are so vague as to render the opinion useless, the use of phrases such

as "moderate" or "mild" by a consultative examiner does not automatically render an opinion

impermissibly vague.  *See Rosenbauer v. Astrue*, 2014 WL 4187210, *16 (W.D.N.Y. 2014)

(collecting cases).  In this case, Finnity provided an assessment after conducting a thorough

examination of Ross, including requiring him to perform objective tests to assess his attention,

concentration and memory skills.  Similarly, although Altmansberger did not conduct an

examination of Ross, his opinion demonstrates that he reviewed Ross's treatment records,

including records from Brown and St. Mary's Health and Finnity's opinion.  (Tr. 272).

Accordingly, the opinions of Finnity and Altmansberger were based upon either treatment records or an examination of the claimant, and thus adequately support the ALJ's ultimate conclusions.  *See id.* (collecting cases).

Finally, I disagree with Ross's contention that the ALJ failed to account for the moderate mental impairments that he assessed at step three when formulating his RFC later in the sequential evaluation.  (Docket # 12-1 at 21-22).  At step three of his determination, the ALJ determined that Ross had mild limitations in performing activities of daily living and moderate difficulties in social functioning and maintaining concentration, persistence and pace.  As the ALJ noted in his decision, the limitations identified were "not a residual functional capacity assessment but [were] used to rate the severity of mental impairments as steps 2 and 3 of the sequential evaluation process."  (Tr. 23).  Thus, a conclusion that a claimant suffered from moderate impairments at steps two or three is not necessarily inconsistent with a conclusion that a claimant is not disabled.  *See McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014); *see Huestis v. Comm'r of Soc. Sec.*, 2014 WL 4209927, *5 (D. Vt. 2014) ("[t]he ALJ is not required to explicitly include the "paragraph B" limitations in his RFC assessment or hypothetical to the VE") (collecting cases).  In any event, as discussed at length above, the ALJ adequately accounted for Ross's moderate limitations in formulating his RFC.

Nothing in the record suggests that Ross in unable to perform unskilled work. Indeed, the record reflects that Ross was able to manage his own finances and to return to work as a CNA.  According to his testimony, Ross left that employment due to a kidney illness, not due to his inability to perform the functional mental requirements of that employment.  Although Ross reported anger and difficulty getting along with others, he testified that he is able to work in proximity to others, and Finnity opined that Ross could relate adequately with others.  In

addition, although Ross initially reported that he suffered depression and anxiety-related symptoms upon learning of his diagnosis, his treatment records reflect that those symptoms subsided with time and that by early 2011 Ross reported to his treating physicians that his depression-related symptoms had resolved and that he had successfully returned to work. (Tr. 380-86, 461-67, 501-03)  This is consistent with Ross's mental health treatment records which reveal that Ross discontinued treatment in early 2011.  (Tr. 362-66).  I conclude that the ALJ's RFC assessment was based upon a thorough review of the record and was supported by substantial record evidence; accordingly, remand is not warranted.  *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) ("[n]one of the clinicians who examined [claimant] indicated that she had anything more than moderate limitations in her work-related functioning, and most reported less severe limitations[;] [a]lthough there was some conflicting medical evidence, the ALJ's determination that [p]etitioner could perform her previous unskilled work was well supported").

### B.     Step Five Assessment

Finally, I turn to Ross's contention that the ALJ erred in relying on the vocational expert because the hypothetical posed to the expert was based upon a flawed RFC assessment. (Docket ## 9-1 at 24, 14 at 5-6).  Having determined that substantial evidence supports the ALJ's RFC determination, this argument is rejected.  *See Wavercak v. Astrue*, 420 F. App'x 91, 95 (2d Cir. 2011) ("[b]ecause we have already concluded that substantial record evidence supports the RFC finding, we necessarily reject [plaintiff's] vocational expert challenge").

### CONCLUSION

After careful review of the entire record, this Court finds that the Commissioner's denial of SSI/DIB was based on substantial evidence and was not erroneous as a matter of law.

Accordingly, the ALJ's decision is affirmed.  For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 16)** is **GRANTED**.  Ross's motion for judgment on the pleadings **(Docket # 12)** is **DENIED**, and Ross's complaint (Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**

<div style="text-align: right;">

*s/Marian W. Payson*
_____
MARIAN W. PAYSON
United States Magistrate Judge

</div>

Dated: Rochester, New York
      March 16, 2015